

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

ZA/HLJ
F. #2011R01655

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

April 24, 2015

**TO BE FILED UNDER SEAL[1]**

By Hand and ECF

The Honorable John Gleeson
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

          Re:    United States v. Lawal Babafemi
                Criminal Docket No. 13-109 (JG)

Dear Judge Gleeson:

       The government respectfully submits this letter in connection with the defendant's sentencing, scheduled for May 15, 2015, and in response to the defendant's request for a below-Guidelines sentence of 15 years' imprisonment. For the reasons set forth below, the Court should sentence the defendant to term of imprisonment as called for the by United States Sentencing Guidelines (hereinafter, "USSG" and the "Guidelines"). Such a sentence will constitute just punishment and reflect the serious nature of the defendant's terrorism offenses.

---

          [1]    The government is filing this letter under seal because the defendant indicated in his sentencing memorandum that he wanted the discussion of his treatment by Nigerian authorities to remain under seal so that he and his family were not subject to retribution for having made claims about abuse at the hands of Nigerian security services. The government will file a redacted version of this letter, which omits this footnote and Section II.B. infra, discussing the defendant's treatment in Nigerian custody, on the public docket.

I.        Background

          A.        Offense Conduct and AQAP Background

The defendant Lawal Babafemi is a Nigerian citizen who traveled to Yemen to join and train with al-Qaeda in the Arabian Peninsula ("AQAP"), the branch of al-Qaeda that has been linked to the greatest number of plots targeting the U.S. homeland in recent years. While in Yemen, the defendant received weapons training from AQAP and contributed to its English-language media wing, which publishes al-Qaeda propaganda aimed at recruiting people in the United States and Europe to conduct violent attacks in their home countries on behalf of the terrorist group.

The defendant made two trips to Yemen in furtherance of his efforts to join AQAP.  He wanted to fight jihad in either Yemen or Iraq, but chose Yemen because it was mentioned in a *hadith*, or saying of the Prophet Muhammad.  According to that *hadith*, the Prophet predicted that an army of 12,000 men would emerge from Yemen to bring victory to Islam.  On his first trip to Yemen, in January 2010, Babafemi and another Nigerian individual attempted to join AQAP.  After a couple of months, the two were apprehended at a roadside checkpoint in Yemen and deported to Nigeria because they lacked proper identification papers.  Then, in January 2011, Babafemi again went to Yemen, this time alone.  Babafemi traveled by land from Nigeria to Chad, and ultimately Sudan, from where he was smuggled by boat to Yemen.  Babafemi was assisted by a Ugandan jihadist facilitator in Sudan.

According to the defendant's friend and co-conspirator, Luqman Babatunde, Babatunde and Babafemi discussed al-Qaeda and Inspire magazine extensively before Babafemi departed for Yemen.  Inspire Magazine, discussed further infra, is an English-language internet magazine published by AQAP with the goal of recruiting and training individuals in the West to conduct attacks in their home countries.  A typical issue of Inspire contains exhortations to violence in the form of articles or poems, justifications for killing civilians in terrorist attacks, and instructions for preparing bombs and improvised explosive devices.  Babafemi and Babatunde agreed that al-Qaeda was doing great things for Muslims in their region, and were glad to learn that there were jihadist publications available in English.

Babatunde created two email accounts for Babafemi to use to stay in touch with him when he reached Yemen – welovebilal@yahoo.com and uloveumar@yahoo.com. When Babafemi departed for Yemen, he indicated to Babatunde that he was going in search of the publishers of Inspire.  Once he arrived in Yemen in 2010, Babafemi asked Babatunde, who remained in Nigeria, to send an email to Inspire magazine to let its editors – i.e., the

2

leaders of AQAP – know that he had arrived.  Babatunde sent the email, using the code that the "package had arrived," but received an error message in response.

After linking up with an AQAP facilitator in Yemen, Babafemi was transported to an AQAP safehouse in Abyan.  Babafemi took the *bayat*, or oath of allegiance, to AQAP while in that safehouse.  AQAP members typically adopt *noms de guerres* – or *kunyas*, the Arabic term commonly used amongst jihadists – in order to mask their true identities, and Babafemi chose "Abu Abdullah" as his *kunya*.  "Abu Abdullah" means father of Abdullah, and Babafemi in fact has a son named Abdullah.  PSR ¶ 42.  In addition to adopting a *kunya*, Babafemi was instructed by AQAP officials not to disclose to anyone else that he was from Nigeria and, instead, to pretend to hail from Ethiopia.

Babafemi spent approximately a week at the safehouse in Abyan, during which he time he met several other individuals from English-speaking countries who had traveled to Yemen and joined AQAP.  For example, Babafemi first met Minh Quang Pham, a British citizen joined AQAP in late 2010, in Abyan.  Pham, who used the *kunya* "Amin," has been charged in the Southern District of New York with providing material support to, and receiving military training from, AQAP, and is currently awaiting trial.  Babafemi also met American citizen Samir Khan, who used the *kunya* "Kaka," (also spelled "Qaqa") in Abyan.  Samir Khan was a close associate of AQAP senior leader and cleric Anwar al-Awlaki and was in charge of AQAP's English language media wing, al-Malahem Media.[2]  In addition, Babafemi met Sami Ali al-Fadli, a British member of AQAP who used the *kunya* "Abu Yahya," in Abyan.

After approximately a week in Abyan, Babafemi was moved to an AQAP safehouse in Shabwa.  He stayed in Shabwa for several months and moved between at least three different AQAP safehouses while he was there.  Babafemi met a Somali liaison from the terrorist group al-Shabaab to AQAP named Ahmed Warsame, who used the *kunya* "Jafar," at the first Shabwa safehouse.  Warsame was charged with terrorism offenses in the Southern District of New York and pleaded guilty in 2011 to nine crimes including providing material support to al-Shabaab and AQAP, conspiring to teach and demonstrate the making of explosives, and possessing firearms and explosives.

During his time in Shabwa, Babafemi reconnected and interacted extensively with Samir Khan, Ming Pham and Sami al-Fadli.  Babafemi and Khan in particular were very close.  Khan was a longtime member of AQAP who was very close to Anwar al-Awlaki.  Khan began the publication of Inspire Magazine and authored an article in one of its original issues entitled, "I am Proud to be a Traitor to America."  Babafemi, Pham and Fadli

---

[2] Khan and Awlaki were both subsequently killed in U.S. counterterrorism operations.

3

all contributed writing and editing assistance to the AQAP's English-language media operations, which were run by Khan.  Babafemi, Pham, Fadli and Khan all appeared together, in camouflage and holding AK-47 rifles, in a photograph published at page 62 in the Issue 5 of Inspire magazine and attached hereto as Exhibit A.

Babafemi wrote English rap lyrics about jihad because Khan and Pham had come up with the idea to record rap songs as propaganda for AQAP.  According to Khan, the purpose of the English media was to inspire individuals in English-speaking countries to conduct attacks on their own without central direction and coordination from al-Qaeda.  Khan explained to the group that an ability to inspire such lone-wolf attacks was an important means by which AQAP could increase its ability to cause harm and devastation in the West.

Inspire Magazine, whose publication Awlaki and Khan spearheaded, is an important and essential propaganda tool for AQAP.  Articles published in Inspire have been cited by several individuals arrested and charged with terrorism offenses in the United States and Europe as having radicalized them and convinced them to conduct violent attacks in the West.  Inspire issues typically include exhortations to violence against Western countries, such as references to "wiping American out of the map completely" and recommendations to "acquire weapons and learn methods of war."  In addition, Inspire regularly publishes a "hit list" of individuals targeted for assassination in the West because they ostensibly engaged in actions against Islam, such as publishing cartoons of the Prophet Muhammad.   Inspire has published extensive bomb and explosives-making instructions, including the article "How to Make a Bomb in the Kitchen of Your Mom," which has been downloaded by many individuals charged with terrorism and weapons of mass destruction offenses.  Finally, Inspire often glorifies recent attempted and completed terrorism attacks, such as the Boston marathon attack, the attempted bombing of Times Square in 2010, the attempted "underwear bomb" attack on an airliner headed to Detroit in 2011, the 2010 stabbing of a British member of Parliament, the 2010 suicide attack in Stockholm, and others.

In addition to working on AQAP's media operations, Babafemi also sought and received weapons training from the group.  At the initial safehouse in Abyan, Babafemi was provided with and trained on the use of an AK-47 assault rifle.  Babafemi continually asked AQAP members in Shabwa to be trained on the use of other weapons and explosive devices.

Babafemi routinely carried his AK-47 rifle with him when he traveled around Yemen.  During one trip to an AQAP safehouse, the AQAP convoy with which Babafemi was traveling was stopped by Yemeni officers at a checkpoint.  The driver of the convoy attempted to drive through the checkpoint, and a gunfight ensued.  During this fight,

4

Babafemi fired his AK-47 indiscriminately at the officers attempting to start the convoy.  It is unknown whether anyone was injured or killed during the shootout.

Babafemi's original goal upon arriving in Yemen and joining AQAP was to stay and fight with the group in that country and not to return to Nigeria.  Babafemi told other AQAP members that he wanted to die as a martyr in Yemen.  Eventually, however, after consulting with and receiving direction from AQAP senior leader and cleric Anwar al-Awlaki, Babafemi decided to return to Nigeria.

Babafemi had multiple one-on-one meetings with Awlaki while he was in Yemen.  Awlaki, an American citizen, was a radical cleric, senior leader of AQAP, and al-Qaeda's single most successful English-language propagandist during this time period.  Awlaki's fiery online English-language sermons radicalized countless individuals in the United States and Europe.  For example, Najiballah Zazi and Zarein Ahmedzay, who were convicted in the Eastern District of New York of plotting to bomb the New York City subway system, cited Awlaki's lectures as one of the most important contributing factors to their radicalization and decision to join al-Qaeda.  Awlaki also orchestrated several bomb plots against the United States, including the failed attempt by Nigerian citizen Umar Farouk Abdulmutallab to detonate a bomb hidden in his underwear during a flight to Detroit, and the thwarted attempt to donate explosives disguised as printer cartridges in cargo planes bound for the United States.

The only source of information available to the government about Babafemi's one-on-one meetings with Awlaki comes from Babafemi's Mirandized statements about what occurred during those meetings.  According to Babafemi, Awlaki impressed upon him that AQAP needed additional English speakers in order to enhance its English-language media operations.  He asked Babafemi to return to Nigeria and recruit additional Nigerians to travel to Yemen and work for AQAP's al-Mahalem Media.  Awlaki offered to pay the travel expenses of those recruits.

According to Babafemi, he agreed to travel back to Nigeria and recruit others to join AQAP.  Awlaki told him that an AQAP facilitator would provide him for the money to pay for their travel expenses.  On his way back, Babafemi stopped at a safehouse in Abyan.  Upon confirming that Babafemi was "Abu Abdallah," an AQAP member at that safehouse provided him with the equivalent of $8,600 in cash.  Babafemi then traveled on to Saudi Arabia, where he was arrested for lacking proper identification papers and deported to Nigeria.  Around the same time AQAP dispatched Babafemi to Nigeria, Ming Pham also departed Yemen for his home country, the United Kingdom.  Upon his arrival in the U.K., Pham was arrested in possession of, among other things, a live round of .762 caliber armor-piercing ammunition, which is consistent with ammunition used in AK-47 assault rifles.

5

Once back in Nigeria, Babafemi attempted to recruit multiple individuals, including his friend Luqman Babatunde, to join AQAP.  Babafemi recounted to Babatunde that he had received military training from AQAP, including how to use and fire an AK-47, and met with its senior leadership, including Awlaki.  Babafemi also met with an Imam Babatunde knew and asked that Imam to help him recruit Muslims to travel to Yemen and join AQAP, but the Imam refused.

Babafemi asked Babatunde to send an email on his behalf to AQAP letting them know that Babafemi had safely reached Nigeria.  Babafemi told Babatunde to use the code "back in school," and that AQAP would understand the reference.  Babafemi and Babatunde logged on to the uloveumar email account in Babatunde's office and sent the message.

### B.    Procedural History

Babafemi was arrested in Nigeria in August 2011.  In February 2013, the defendant was indicted in the Eastern District of New York and in September 2013 he was extradited here from Nigeria.  On April 24, 2014, the defendant pled guilty to two counts of the indictment charging him with conspiring to provide and in fact providing material support and resources, including services and personnel, including himself to AQAP, in violation of Title 18, United States Code, Section 2339B(a)(1).

## II.    Guidelines Calculation

### A.    The PSR Correctly Assesses the
### Sentencing Range Under the Guidelines

In the PSR, the Probation Department calculated the defendant's offense level as 35, his criminal history category as VI, and his Guideline imprisonment range as 292 to 365 months.  However, the statutorily authorized maximum sentence is less than the maximum of the applicable Guideline range.  Accordingly, the effective Guideline range is 292 to 360 months.  PSR ¶¶ 30, 33, 58.  The defendant agrees with these calculations, though he appears to take issue with the application of the terrorism enhancement.  See Def. Mem. n.2.[3]

---

[3]    In particular, the defendant argues that the terrorism enhancement is "draconian" and unfair, noting that there is a dearth of data demonstrating that defendants convicted of terrorism-related offenses are more likely than other criminals to recidivate.  Id. at 2-3, n.2.  The defendant's argument has been previously and frequently rejected by the courts.  As he acknowledges, the Second Circuit in United States v. Meskini, 319 F.3d 88, 92

6

B.      A Downward Departure for Pre-Trial
        Conditions of Confinement Is Appropriate

The defendant seeks a downward departure based on allegations that he was tortured while in custody of the Nigerian State Security Service ("SSS"). Def.'s Mem. at 11-24. In his submission and the accompanying affidavits, the defendant claims that he was tortured by the SSS for approximately two months and subjected to severe conditions of confinement during the balance of time he was in SSS custody. Id. For the reasons stated below, the government does not object to the Court considering the period of time the defendant was in Nigerian custody when imposing sentence in this case.

"[P]re-sentence confinement conditions may in appropriate cases be a permissible basis for downward departures." United States v. Carty, 264 F.3d 191, 196 (2d Cir. 2001). Such departures may be warranted where the defendant experienced pre-sentence conditions that were "qualitatively worse than conditions at a federal correctional facility." United States v. Francis, 129 F. Supp. 2d 612, 616 (S.D.N.Y. 2001); see United States v. Brooks, No. 07-CR-187 (CPS), 2008 WL 4693335 (E.D.N.Y. Oct. 23, 2008) (downward departure granted where defendant was held in the SHU for approximately 10 months). The government has no information corroborating any specific claims of torture made by the defendant regarding his treatment while in Nigerian custody. To the contrary, the government has been assured by the government of Nigeria, including representatives of the SSS, that the defendant was treated in accordance with international standards and was not tortured. Nonetheless, the government agrees that the conditions of confinement the defendant experienced while in Nigerian custody were inferior to that of the Bureau of Prisons. Accordingly, the government has no objection to the Court taking into consideration the 23 months of incarceration that the defendant experienced in Nigeria prior to his extradition to the United States and granting him a modest downward departure on that basis.

---

(2d Cir. 2003), rejected a challenge to the terrorism enhancement's effect on a defendant's criminal history category, finding that Congress and the Sentencing Commission had a "rational basis for concluding that an act of terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal, and thus, that terrorists and their supporters should be incapacitated for a longer period of time." Id. at 92. The terrorism enhancement in properly applied in this case.

7

C.      The Defendant's Consent to Extradition is
        Not a Basis for a Downward Departure

The defendant also contends that he should receive a variance or downward departure from the Guidelines because he consented to his extradition.  Def. Mem. at 24-25. He argues that because he "chose to face the music" and thereby "spared the executive branch of the government years of costly international wrangling by summarily consenting to his extradition," he warrants "additional consideration beyond the three-point deduction he is afforded pursuant to Guideline §§ 3E1.1(a) and (b).  Id.  The government is not aware of any cases, and the defendant has cited none, in which a court has granted a downward departure on the basis that the defendant consented to extradition to the United States.  While the Court may of course consider the defendant's actions in the context of the 3553(a) factors, see, e.g., United States v. Tapia-Holguin, 376 Fed. App'x 85 (2d Cir. 2010) (noting the appropriateness of the district court's consideration of the defendant's consent to extradition in the context of 18 U.S.C. § 3553(a)), no adjustment to the Guidelines calculation on this basis is appropriate.

III.    Applicable Law

It is settled law that "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.  As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark."  Gall v. United States, 552 U.S. 38, 49 (2007) (citation omitted).  Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party.  In so doing, [it] may not presume that the Guidelines range is reasonable. [It] must make an individualized assessment based on the facts presented."  Id. at 50 (citation and footnote omitted).

Title 18, United States Code, Section 3553(a) provides that, in imposing sentence, the Court shall consider:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed –

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct; [and]

(C) to protect the public from further crimes of the defendant.

Section 3553 also addresses the need for the sentence imposed "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2)(D). "[I]n determining whether to impose a term of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, [the Court] shall consider the factors set forth in section 3553(a) to the extent that they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a).

It is well-settled that, at sentencing, "the court is virtually unfettered with respect to the information it may consider." United States v. Alexander, 860 F.2d 508, 513 (2d Cir. 1988). Indeed, Title 18, United States Code, Section 3661 expressly provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." Thus, the Court must first calculate the correct Guidelines range, and then apply the 3553(a) factors to arrive at an appropriate sentence, considering all relevant facts.

IV.    Discussion

A.    The Nature and Seriousness of the Offense

The defendant sought out and joined the terrorist group most willing and determined to attack Americans and Europeans in their homelands. AQAP has claimed responsibility for more attacks directed against the United States than any other terrorist group in the past decade, and has made the use of English-language propaganda exhorting violence its trademark. Under the leadership of Awlaki, who was determined to strike the West where he was convinced it would hurt them the most, AQAP directed several attacks, such as the Christmas Day attack on the airliner bound for Detroit in 2009 and the 2010 attempt to detonate bombs disguised as printer cartridges over U.S. airspace. In addition, the group pioneered the use of slick, English-language propaganda that attempted to speak to Western youths using words and cultural concepts they understood.

The defendant's decision to join AQAP was made squarely within this context. AQAP was not the most-readily accessible jihadist group, nor even the most readily-accessible al-Qaeda affiliate, for a Nigerian citizen; Boko Haram in Nigeria, and al-Qaeda in the Islamic Maghreb ("AQIM"), which operates in the Sahel, respectively held those two distinctions. Instead, in January 2010, at the time the defendant decided to make the lengthy and arduous trek to Yemen to join AQAP, the organization was most well-known for having dispatched a Nigerian jihadist, Umar Farouk Abdulmutallab, to detonate a bomb in his underwear aboard a flight bound for Detroit on Christmas Day, 2009. Babafemi was aware of this thwarted attack, and it is difficult to imagine that the coincidence of his deciding to go

9

Yemen to join AQAP the following month is only that. After Babafemi was deported back to Nigeria and began making plans to return to Yemen, AQAP was again in the news, in October 2010, because of the thwarted printer bombs in cargo planes plot. In addition, AQAP was very well-known globally for publishing Inspire Magazine, the first English-language jihadist publication aimed at Western readership. Samir Khan's article "I am Proud to be a Traitor to America," was published in the second issue of Inspire in October 2010. Babafemi was aware of and impressed by Inspire, and he discussed it admiringly with Luqman Babatunde before making his second trip to Yemen around December 2010.

Babafemi sought out AQAP as his violent jihadist group of choice, despite the difficulties involved in reaching both Yemen and Awlaki, because of its determination to and success in attacking the West. There is simply no other good reason a Nigerian citizen inclined towards violent jihad would feel the need to travel all the way to Yemen in order to find like-minded individuals. And while he attempts to separate AQAP's propaganda from its acts of violence, AQAP itself has made clear that the single-minded purpose of its media operations is to generate violence. Faced with the limitations on its ability to strike at the West from afar – as was highlighted by the thwarting of its two major plots in those years, the first due to technical failure and the second due to law enforcement activity – AQAP presciently recognized that the easiest way to kill in the West was to convince the people already in those countries to do the killing.

That was the goal of Inspire Magazine, and it succeeded. As described above, several individuals charged with "lone wolf" terrorism offenses have cited Inspire as a crucial factor in their radicalization. Months after Inspire published directions as to how to build a pressure cooker bomb in its "Lone Mujahid Handbook" issue, the Tsarnaev brothers used those directions to build the bombs they donated at the Boston Marathon in 2013. The defendant worked to increase al-Mahalem Media's reach by writing rap lyrics to connect with segments of Western populations that its current publications were not reaching. Again, the message being spread by AQAP through its media was singular and unwavering: individuals in Western countries should kill those around them, government, military or civilian, through whatever means they could, including stabbings, shootings, and bombings. Muslims in Western countries were continually reminded that they lived in the place where they could cause the "greatest harm to the enemy," and instructed that it was their duty to do so. This is the message that Babafemi, while he assisted with the AQAP's media publications in Shabwa, helped spread.

In addition to exhorting others to violence, Babafemi also engaged in it himself. He received weapons training from AQAP and regularly carried an AK-47 assault rifle with him while in Yemen. He continually sought additional military training. As described above, when traveling as part of an AQAP convoy, Babafemi along with others shot at Yemeni officers attempting to stop the convoy at a checkpoint. When he returned to Nigeria, Babafemi bragged about his weapons training to his co-conspirator, Luqman Babatunde.

10

Nothing about Babafemi's conduct in Yemen or upon returning to Nigeria in 2011 supports his claim that "[n]ot long after his arrival [in Yemen] he became wary and uncomfortable with his decision to join" AQAP. Def. Mem. at 9. Firstly, it is difficult to imagine what characteristics of the group would suddenly render Babafemi a reluctant recruit, when he was well aware of its commitment to violence against the West at the time he traveled to Yemen. Secondly, according to a cooperating witness who was with Babafemi in Yemen, he continually sought additional military training, developed a close friendship with Samir Khan, and enjoyed working on producing English-language propaganda, including rap lyrics, for AQAP. Babafemi expressed to AQAP that he had traveled to Yemen to fight, and initially indicated that he had no desire to return to Nigeria. His decision to return to Nigeria was made after private discussions with Awlaki. Babafemi claims that Awlaki asked him to recruit other English-speakers for the group's media operations upon his return to Yemen. We have only Babafemi's word for the fact that those were the only instructions with which Awlaki dispatched Babafemi back to Nigeria. It is difficult to imagine that Awlaki saw Babafemi as nothing other than a useful recruiter for the group, since the last Nigerian citizen committed to jihad who had traveled to Yemen and joined AQAP had successfully – per Awlaki's direction – obtained a visa to travel to the United States and boarded an airliner bound for Detroit with a bomb sewn into his underwear. Awlaki was well aware of the fact that Nigerian citizens have more connections in, and readier access to, the United States than non-English speaking citizens of various Middle Eastern countries.

Yet, according to the defendant, the only thing Awlaki asked him to do was return to Nigeria and send five other recruits to Yemen to work on media operations. He further claims that he initially refused to do so and ultimately agreed only because he felt threatened that AQAP members in Nigeria would exact revenge on him if he failed to agree. Def. Mem. at 9. This defies the evidence and common sense. Babafemi had undertaken two arduous journeys to reach Yemen and join AQAP. He had done so with full knowledge that AQAP was the branch of al-Qaeda most determined to conduct, and to inspire and equip others to conduct, attacks on U.S. and European soil. Once he swore *bayat* to AQAP, Babafemi expressed his pleasure at being a member of the group to and desire to contribute further to its media operations and work in its military wing. When he returned to Nigeria, Babafemi's first concern was letting AQAP know that he had successfully reached home. This is not the mindset of a man under threat. Furthermore, Babafemi actually tried to recruit others to join AQAP, including Luqman Babatunde and an Imam. Babafemi bragged about his military training to Babatunde and never, in his attempt to recruit Babatunde, suggested that Babatunde's only role within AQAP would be media operations.

In addition, Babafemi's suggestion that AQAP would threaten one of its members who was about to leave Yemen and return to his home country is nonsensical. Al-Qaeda is one of the most hunted groups in the world. Its affiliates and members take the utmost care to avoid detection and employ the highest levels of operational security. The idea that as prominent and targeted a figure as Anwar al-Awlaki would let anyone he did not trust have information about his whereabouts and security measures and travel to locations outside of AQAP's control with that information is ridiculous. Terrorist groups such as

11

AQAP are well aware that the United States sometimes conducts counterterrorism operations in other countries, and Awlaki was killed in one such operation in Yemen in September 2011. Therefore, details about about the location of senior leaders and safehouses is among their most closely-held and carefully-guarded information. Anyone made privy to such information, as Babafemi was, would have to be a vetted and trusted member of the group. Furthermore, AQAP would be reluctant to allow someone with that information to leave their area of control, and return to a country where he could freely speak with foreign law enforcement authorities, unless they believed that the person could be fully trusted not to share the information about AQAP's safehouse locations and planned activities with anyone. Certainly someone Awlaki had to threaten to even get to agree to recruit others to join the group would not fall within this narrow category.

Finally, Babafemi's actions upon returning to Nigeria make clear that he was committed to supporting AQAP. In the couple of months between his return and his arrest by Nigerian authorities, he attempted to recruit others to join the group. What Babafemi would have done on behalf of AQAP had he not been arrested is unknown. The fact that he had not engaged in any violence or any attempt to travel to a Western country during those few months does very little to predict whether or not he would have done so if he had had more time. Most terrorist groups, such as al-Qaeda and AQAP, advise the operatives they deploy to the West to "lay low" for some period of time after they arrive because recent arrivals or returnees are more likely to be subject to law enforcement surveillance. Indeed, one of the attackers of the Charlie Hebdo magazine in Paris, Cherif Kouachi, traveled to Yemen in 2011 where he met and trained with Awlaki; Kouachi and Babafemi may have been in Yemen with AQAP at the same time. Kouachi returned to France months later having been provided with $20,000 in cash by AQAP. Yet, it took over three years for Kouachi to orchestrate and execute the attack against Charlie Hebdo, despite the fact that his commitment to jihad and AQAP did not waver.

AQAP's commitment to violence against the West and Babafemi's support for that goal renders unlikely the possibility that Babafemi returned to Nigeria without any plans to encourage or conduct violence on the group's behalf. The fact that Babafemi and Pham were both dispatched to their home countries by AQAP around the same time, the upcoming tenth anniversary of the attacks of September 11, 2001, and the types of plots that Awlaki was designing in 2010 and 2011 suggest that Awlaki's plan for Babafemi was more extensive and different in kind from what Babafemi has admitted. Nonetheless, even taking into account only what Babafemi managed to do on behalf of AQAP before his arrest, his offense of materially supporting terrorism merits a Guidelines sentence.

B.    History and Characteristics of the Defendant

In addition, the defendant's personal history and characteristics weigh in favor of a Guidelines sentence. It is true the defendant has suffered more than his share of personal hardship, as detailed in the PSR and in his sentencing submission. On the other hand, neither tragic circumstances, such as sexual abuse and the loss of a child, nor positive characteristics,

12

such as his rejection of male chauvinist conventions, significantly mitigate the defendant's extraordinary choice to abandon the responsibility of caring for his family and travel thousands of miles across a continent – on two separate occasions – to join a terrorist organization. Def. Mem. at 30. The argument that he was not "hateful.. intolerant…[or] violent" and that he was a "family man" is incongruous with his actions and with his decision to join a hateful, intolerant and violent terrorist organization, to receive weapons training from them and to work towards spreading their message and recruiting others to their cause. Id. at 2, 30. These actions belie the defendant's claims about his mindset and family orientation. Simply put, the history and characteristics of the defendant do not warrant a below-Guidelines sentence.

The defendant contends that when fashioning a sentence, the Court should consider the fact that Nigerians have a statistically shorter life expectancy than Americans. Def. Mem. at 28-30. This argument is flawed and should be rejected by the Court. Life expectancy is a statistical measure of how long a person may live based on a variety of demographic factors, not just the country of his birth. Firstly, the defendant no longer lives in Nigeria and thus some of the demographic factors that affect life-expectancy, such as quality of and access to medical care, and risk of death by random violence, have necessarily changed. More importantly, the most commonly used framework of life expectancy is life expectancy at birth. Because this measure may be significantly lowered by factors peculiar to babies and infants, such as high infant mortality, life expectancy is often misinterpreted as leading to the conclusion that a population with a low life expectancy will necessarily have a smaller proportion of old people. Nigeria has a particularly high under-five mortality rate, which lowers its average life expectancy without suggesting that those who live past the age of five will have dramatically shorter lives than their counterparts in other countries. See The World Bank, "Mortality Rate, under-5 (per 1,000 live births)" (last visited Apr. 23, 2015), http://data.worldbank.org/indicator/SH.DYN.MORT/countries (noting that, in fact, there were only 8 countries with worse under-five mortality rates than Nigeria in 2013). See Laden, Greg, "Science Blog, Falsehood: 'If this was the Stone Age, I'd be dead by now,'" (last accessed April 23, 2015), http://scienceblogs.com/gregladen/2011/05/01/falsehood-if-this-was-the-ston/. Thus, the defendant's claims that he is likely to die at a significantly younger age than a similarly-situated American-born person and that his sentence should be adjusted to account for this fact should be rejected.

As noted above, the government has no objection to the defendant receiving some consideration under the 3553(a) factors for the fact that he waived extradition. His decision to do so facilitated the government's case and reflects his willingness to take responsibility for his crimes.

13

Finally, there is a need for specific deterrence in this case. It is striking that the defendant was undeterred in his efforts to join AQAP. In 2010, the defendant undertook an arduous journey to Yemen that was cut short because he was arrested and deported to Nigeria shortly after arriving. PSR ¶ 5. The defendant nonetheless turned right around and tried again. This time, he managed to meet Anwar al-Awlaki and swore *bayat* to AQAP. There is simply no basis for concluding, as the defendant contends, that he was "not fully committed" to AQAP's goals, Def. Mem. at 4, because he was arrested in Nigeria within weeks of his return and had by that time already tried to recruit two individuals to join the group. The facts that he immediately reached out to AQAP to let them know he had safely arrived in Nigeria, and that he extolled the virtues of the group and bragged about his receipt of weapons training to Babatunde, suggest a much greater commitment to its members and aims than what the defendant admits. As a result of his demonstrated and dogged willingness to join AQAP, his allegiance to the group and his recruitment of others, a Guidelines sentence is sufficient but not greater than necessary to ensure that he is incapacitated and deterred from ever following down this path again.

V.     Conclusion

By joining AQAP, assisting with its English-language media wing, and agreeing to recruit additional AQAP members in his home country to return to Yemen, the defendant committed some of the most serious offenses in the United States Code. Accordingly, the government seeks a severe sentence within the Guidelines range.

Respectfully submitted,

LORETTA E. LYNCH
United States Attorney

By:        /s/
Zainab Ahmad
Hilary Jager
Assistant U.S. Attorneys
(718) 254-7000

Cc:    Lisa Hoyes, Esq. (by email and ECF)
Jennifer Fisher, U.S.P.O. (by email)