1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X
UNITED STATES OF AMERICA,      :
                               :   13-CR-109(JG)
                               :
                               :
      -against-                :
                               :   United States Courthouse
                               :   Brooklyn, New York
                               :
LAWAL BABAFEMI,                :
                               :
            Defendant.         :   Wednesday, August 12, 2015
                               :   2:00 p.m.
                               :
                               :
                               :
- - - - - - - - - - - - - - - X

TRANSCRIPT OF CRIMINAL CAUSE FOR SENTENCING
BEFORE THE HONORABLE JOHN GLEESON
UNITED STATES DISTRICT COURT JUDGE

A P P E A R A N C E S:

For the Government:   KELLY T. CURRIE, ESQ.
                      United States Attorney
                      BY: ZAINAB AHMAD, ESQ.
                          HILARY JAGER, ESQ.
                          Assistant United States Attorneys

For the Defendant:    FEDERAL DEFENDERS
                      BY: LISA HOYES, ESQ.


                      UNITED STATES PROBATION DEPARTMENT
                      BY: JENNIFER FISHER, **USPO**


Court Reporter:   FREDERICK GUERINO, CSR
                  Official Court Reporter
                  Telephone: (718) 613-2503
                  E-mail:  Frederickguerino@aol.com

Proceedings recorded by computerized stenography.  Transcript produced by Computer-aided Transcription.

2

THE COURT:  Good afternoon, everyone.

THE COURT CLERK:  United States v. Lawal Babafemi.

THE COURT:  Okay.  State your appearances, please.

MS. AHMAD:  Zainab Ahmad and Hilary Jager for the United States.

Good afternoon, your Honor.

MS. JAGER:  Good afternoon.

MS. AHMAD:  We are joined at counsel table a special agent from the FBI.

MS. FISHER:  Jennifer Fisher from U.S. Probation.

Good afternoon, your Honor.

THE COURT:  Good afternoon.

MS. HOYES:  Federal Defenders by Lisa Hoyes for Mr. Babafemi.

THE COURT:  Okay.  There's a presentence report.

Have you read this and gone over it with your client, Ms. Hoyes?

MS. HOYES:  Yes, I have.

THE COURT:  Is that right, Mr. Babafemi?

THE DEFENDANT:  Yes.

THE COURT:  You had enough time to go over it with your lawyer?

THE DEFENDANT:  Yes.  Thank you.

THE COURT:  There's a little bit of a back and forth about the terrorism enhancement in one of the papers

3

that both sides have submitted in connection with sentencing.  Thank you both for them, but I understand that really could be more of a 3553 issue than a guideline computation issue; is that right?

MS. HOYES:  Yes, your Honor.

THE COURT:  So we'll deal with it in that setting. Any objection to the presentence report or the guideline computation?

MS. HOYES:  No, your Honor.

THE COURT:  How about from the Government?

MS. AHMAD:  No, Your Honor.

THE COURT:  So the advisory range, as I understand it, is 292 to 365, but it's capped to 360, right?

MS. AHMAD:  That's correct.

MS. HOYES:  Yes.

THE COURT:  Okay.

There's some paperwork that's been submitted to me in connection with conditions of confinement prior to the extradition.  It's my intention to deal with that, to the extent there is a dispute between the parties, to deal with that by reference to the papers and not in any other way.

Any objection to that, Ms. Hoyes?

MS. HOYES:  No, your Honor.

THE COURT:  How about you?

MS. AHMAD:  No, Judge.

4

THE COURT:  All right.

As I understand it, the Bureau of Prisons - and I'm saying this so you can correct me if I'm wrong - the Bureau of Prisons computes the commencement date of this sentence as September 27 of 2013, which I think is the date that he arrived here, and not the August 2011 date he was taken into custody in Nigeria; is that correct?

MS. AHMAD:  Your Honor, it is my understanding that he will be given credit for that time by the Bureau of Prisons, because it's time served in custody that did not count towards any other sentence.

THE COURT:  Oh, it will.

MS. HOYES:  That's my understanding as well, your Honor.  I would appreciate, however, that you do flag it for the BOP Foreign Custody Calculation Unit.

THE COURT:  Well, we'll make explicit on the judgment that it's my understanding that that is the commencement date in computing the sentence, so that in the event we all get it wrong, you can come back and you can seek the appropriate relief.

What is that date?

MS. AHMAD:  I believe it's August 19, 2011.

THE COURT:  Okay.  I know it is August.  Is that your understanding, too?

MS. HOYES:  Yes, that's correct.

5

THE COURT:  Okay.  All right.

Would you like to be heard with regard to the appropriate sentence?

MS. HOYES:  I would, your Honor.

Your Honor, we understand how serious this crime is, and we seek a sentence here of 15 years, which is a huge amount of time.  It is a sentence that sends a strong message to foreigners considering joining Jihadist groups.  It's a sentence that would substantially punish Mr. Babafemi.  And it is a sentence that would keep him incapacitated until he's an old man by Nigerian standards anyway.

He renders his wife a life without a partner, and it's extremely likely that his mother will die while he's in custody here in the United States.

Prison will be harsher for him than for others because he has absolutely no ties to this country.  He will never get a visit, have extremely minimum phone contact with his family, which has been the case the entire time he's been incarcerated here, and he will continue to suffer the symptoms of posttraumatic stress disorder.

Your Honor, the Department of Probation evaluates every single terrorism case, every single terrorism defendant that is sentences in this courthouse.  They are familiar with the range of conduct involved in these cases.

6

And the Department of Probation here has recommended a sentence of 18 years, which is substantially below the recommended guidelines range.

Additionally, the government acknowledges that Mr. Babafemi is entitled to a downward departure based on the conditions of confinement in Nigeria.  The government also acknowledges that he should receive consideration under 3553(a), that he consented on the extradition.  That he spared the government years of international wrangling, and even the possibility that he would never have to face charges here in the United States.  By the government's account, it reflects him taking responsibility for his crimes.

In referring to the argument made in my papers, there are Nigerians who successfully evaded extradition by fighting it for many, many years in Nigeria.

Fifteen years is a very long sentence.  We submit that it is the sentence that is sufficient, but not greater than necessary, to meet the goals of sentencing here.

Your Honor, may we have a very brief side bar?

THE COURT:  Yes.

7

(Side bar)

MS. HOYES:  Your Honor, can my client come up here?

THE COURT:  Yes, that's fine.  Bring him up here, please.

MS. HOYES:  Sorry to interrupt.  I just noticed you mentioned the conditions of confinement.  You refer to it as torture, and I know last night in your ruling that that information is all unsealed and available to the press. I wanted to make sure I wasn't missing anything.

THE COURT:  You are not.

MS. HOYES:  Before I make any public statements.

THE COURT:  I was being unnecessarily circumspect.

MS. HOYES:  Thank you.

THE COURT:  Okay.

(Side bar ends)

8

MS. HOYES:  I apologize for the interruption.

THE COURT:  Okay.

MS. HOYES:  Your Honor, Mr. Babafemi was held in non-communicato and brutally tortured in Nigeria.  I will not rehash the details of what he experienced.  They are very clearly set out in my papers.  But our criminal law recognizes that such conditions of confinement are not consistent with our values, and not consistent with the brutal punishment that he suffered during that time period, and must be accounted for here with the reduction of sentence.

One of the key arguments I make, Mr. Babafemi regrets his action in joining al-Qaeda and violent extremists generally, and that he poses no future risk of reoffending.  He now spends time reflecting on his actions and religion.  He says violent Jihad has no place in Islam. And I will call to your attention a paragraph in his letter to your Honor where he says:

My Dear Judge, I only want others to learn from my mistakes.  I therefore denounce the actions I took in joining al-Qaeda and the evil I perpetrated in supporting them.  I denounce al-Qaeda and ideology both in their action and abroad.  Islam is the religion of peace and harmony, and not the act of brutality --

THE COURT:  I want to hear it aloud on the record.

9

Slow down, please.

MS. HOYES:  -- I understand Islam to be the religion of peace and harmony.  Even the profit Mohammed preached peace and unity, and not the act of brutality and barbarism.

The Islam that we are seeing through the world is the so-called Islam Mr. Babafemi rejects of the violent extremists.  It has been demonstrated repeatedly in the letter to your Honor, and the way he comported himself in this case since his arrest.

He made days of inculpatory statements to the FBI and consented to extradition, and accepted responsibility swiftly by pleading guilty in this case, and done in the way he's comported himself in jail.

Mr. Babafemi has been at the MCC for approximately two years now.  He's been in general population for the vast majority of that time.  That means for two years he has been observed on a daily by prison officials at the MCC.  And I want to tell you what I think is not one of the strongest objective indicators, but he's not a dangerous person or dangerous Jihadist.  There was a rather young man that was arrested for conspiring to join ISIS, and I happened to represent that young man as well.  BOP placed that young man in the same unit as Mr. Babafemi.  Not only that, the unit's counselor brought this young man to Mr. Babafemi's cell

10

early one morning and asked him if he would befriend him and guide him. And, your Honor, I submit that BOP staff is deliberate and careful when they house terrorism suspects. That has been my experience in terms of separation orders and things of that nature. And I believe that BOP staff knew from their observations of Mr. Babafemi over the past two years that he was not in sight of this young man.

Instead, what he does, he relied on wisdom he accumulated over the years in prison and instructed this young man that violent Jihad is misguided and wrong. Mr. Babafemi never used this prosecution or this trade of incarceration as a platform for espousing Jihadist ideology or presented himself as a martyr at any point, and in his speech and actions, as demonstrated, he did have a change of heart and would not reoffend.

Your Honor, I think it is matter for the sentencing here today that Mr. Babafemi had never before set foot in the United States. And I think that in some respects this case is substantially different from any other terrorism case in which you imposed sentence, because it lacks an element of betrayal. The other terrorist defendants you sentenced lived in the United Sates, received benefits and privileges of being part of this society, had known American people, and yet still betrayed this country by joining those conspiring against it.

11

Not only did Mr. Babafemi never set foot in the United States, but never met another American person until he was extradicted here for this offense.  He never received any benefits or tastes of what this country has to offer.  And when he knows something through the lens of propaganda, I submit it is possible to believe these hideous things.  And in jail what Mr. Babafemi has instead learned is about the humanity of the American people.  He's come to know criminal defendants and prison guards and lawyers.  He's learned that Americans are people like him, people who have mothers and fathers and who love their children.  And I submit that betrayal exists when a person lives amongst us and wants to destroy us is something uniquely disturbing that is completely absent from this case.  Mr. Babafemi now knows America has no animosity towards the country and its people.

We talk about what are mitigating circumstances.  It is something about what is happening, the way things happen in our lives that explain or shed light on our misdeeds.

Mr. Babafemi as you know grew up in extreme poverty in Nigeria, and I submit this is very different growing up even with extreme poverty, possibly cutting timber and eating wild animals, that is what he had to do to feed his family.  I can't think of a single analogy in the

12

U.S.

In Nigeria, the majority of the population are in extreme poverty, while a very small minority with excessive wealth.  It is pervasive and clear to all of the residents that the country has plenty of natural resources, yet 60 percent of the population lives on less than a dollar a day.  It is a country plagued by massive corruption and lacks any infrastructure for its residents.

Your Honor, this is indeed the type of case where there will never be a satisfactory answer as to why the defendant committed the crime.  It is unfathomable to his family how it happened, and it's unfathomable now to him, that he made these choices four years ago, but the anger and alienation that results from this type of pervasive wealth made it easy for extremist to find and follow groups.  It sheds some light of what happened here.

I once heard your Honor describe a 15-year sentence as bone crushing.  Fifteen years in a prison six thousand miles away from Mr. Babafemi's family would indeed crush his bones.  And it is our position that such a sentence will aptly serve even one of the goals of sentence. This is the appropriate sentence in the case.

THE COURT:  Thank you.

Sir, you have a right to speak before sentence is imposed.

13

Is there anything you want to say?

THE DEFENDANT:  Yes, sir.

I want to say thank you for giving me this opportunity to express my --

THE COURT:  Excuse me for one second.

THE DEFENDANT:  Yes, sir.

THE COURT:  Could you put that microphone closer to him.

THE DEFENDANT:  I want to start by saying I am extremely sorry for anything that I have done in the United States, and I want to say that it doesn't come -- I want to say I denounce al-Qaeda and the extremist groups of the world.

Their actions and my understanding now is obviously I don't understand Islam like that, and the way they act in brutality towards everyone that was against them.  I want to say there were nights when I was in my cell I was thinking about all what is going in Nigeria, and I remember how ISIS took the journalist --

THE COURT:  I'm sorry, how ISIS what?

THE DEFENDANT:  Took the journalist and puts a knife on his neck.  I afraid to imagine myself in such a condition, if I was to do that to somebody and put a knife on my neck, and they start to sweat like animal.  It was extremely hard for me even to sleep at night, because I was

14

thinking how would they be feeling with that when that comes up on the entire ice.  This wasn't their mother, their wives, and their children, just like myself.  So if I have to be in that condition, how would my family feel?  How myself, how would I feel?

THE COURT:  In which condition, the one on the knees?

THE DEFENDANT:  Yes.  So I couldn't be able to be, you know, in that kind of a thing.  I want to say I'm sorry. At first when I was in Nigeria, when I was indicted, I kept asking myself I understood I went to Yemen and I was trying to recruit for the al-Qaeda from Nigeria, and what did that have to do with America?  But eventually when I got here, over time I thought deeply, and I understood eventually sending some people down to Yemen what would they do to them.  Maybe they would put one of them in a plane that would blow up innocent people, children, women.  So I started to think most especially when the case of the police, I felt so much disturbed.  I thought if I send somebody down to Yemen and eventually I send the person back in the world and to carry out such, how would I feel?  How bloody would my hands feel the rest of my life?  Would I be happy with my family?  And I couldn't just imagine.

So I felt and I plead from the bottom of my heart, from the bottom of my heart that indeed I offended the

15

Americans.  I, from the bottom of my heart, feel that I indeed offended the Americans, because al-Qaeda has as our number one enemy the United States, and help them in one way or the other.

So, I will admit to my mistakes and I'm sorry. And I hope this will end, so maybe I can make use of my life, you know, my experience in people who need help in the world that doesn't know what to do with their life.

THE COURT:  How?

THE DEFENDANT:  I believe there are many societies -- they have been rejected by society.  They think they are less bother to even themselves, and from this they think, you know, they come from the right body.  I think I have to make use of my life like this, joining maybe al-Qaeda or ISIS or something like that.  But I hope, I hope that with the knowledge I gained after I was arrested, maybe I can do something to ISIS to make them see through what I have been able to see through, that life is not like that.  There are many ways to lead your life, even to be useful to themselves, to their family, and to their society.

THE COURT:  You mean to talk them out of it?  Do you mean to talk them out of joining Beko Haram or ISIS?

THE DEFENDANT:  Yes, if it's possible for them.

In my unit, there was one Spanish guy who embraced Islam maybe about four, five months ago.  I was standing in

16

the unit and he came to me and we were talking.  He said, let's kill all of the kuffar.  So I looked at him and I asked him, when did you embrace Islam?  He said about four months ago.  I asked him I said before that what were you?  So he looked at me and he said kuffar.

THE COURT:  Go ahead.

THE DEFENDANT:  Yes, sir.

So I just left him standing there and I was looking at him.  So if we look at this, you said let's kill all of the kuffar, and four months ago, so he look to me you become a Muslim if you had been killed at that time, and so when he talks to me after that, he talked, you know, with reason.  So I believe, I believe I gained a lot of experience from this.  I read many books.  I read cover to cover, and I was lost.  I was lost.  There's no way to see how I could be doing that because of the world.  And so just I hope I am given to make use of my life and be a better person to the people I want to, and I am extremely sorry for what I have caused.

THE COURT:  All right.  Thank you.

MS. AHMAD:  Your Honor, let me start by saying that as defense counsel pointed out, we agree with the defendant that he should be given consideration here for two things.  Firstly, that he consented to his extradition from Nigeria, thereby saving the government considerable use of

17

judicial resources.

Also, that his time in Nigerian custody was certainly below the standards of the Federal Bureau of Prisons, and therefore he should be given some credit for that.

While we disagree with the point to the best of our ability some evidence undermining the defendant's claim that he was beaten while he was in custody and during his interrogation, we certainly do agree that the conditions of confinement there in terms of the facility and access to medical care and the like, were sub-standard and below what one would find in a BOP facility.

I think the most difficult issue presented today under the statute is the question of what sentence will be sufficient to protect the public from future crimes of the defendant.

The defendant has put forth a forceful case that he is a changed man, and has no intention to continue along the path to violent Jihad upon which he started.

We believe that to a large extent his denunciation of al-Qaeda, upon which he relies on making that point, rings hollow.  That is principally because all of this rejection of these violent extremist beliefs and of his support for the goals of these sort of groups is not accompanied by any reckoning of his adoption of those

18

beliefs.  In fact, he barely admits to ever having adopted them at all.  If we look at his letter to the Court, he says only that he decided to go to Sudan, and then a calamity befell him.  He continues to insist that from the very moment he encountered al-Qaeda in Yemen, he began thinking of ways to get out and never committed to them.  The record is clearly otherwise here.

Firstly, the record shows that the defendant and his co-conspirator, Luqman Babatunde, were well-aware of al-Qaeda in the Arabian peninsula, present of its activities in Yemen, and that knowledge of those activities was a substantial factor in the defendant's decision to go to Yemen.  We don't know what caused the defendant to be radicalized here.  The government doesn't have that evidence, and the defendant hasn't discussed it at any point.  But at a certain point in at least by late 2009, he certainly was radicalized, and he decided to act on those tendencies by going to Yemen and join AQAP.

There were other closer, less onerous options, available to him for violent Jihad.  Those included Beko Haram in Nigeria, and al-Qaeda affiliates in Africa.  He chose AQAP.  The reason, I submit, we can conclude is that firstly AQAP was very well-known for its targeting of the West.  Its senior cleric at the time Anwar al-Awlaki, whose speeches were promulgated all over You Tube and the

19

internet, widely accessed by Jihadists, and encouraged violent actions against the West in any and all forms.

He, along with another American citizen Samir Khan, pioneered the publication of Inspire magazine, whose goal, again, as described by AQAP, was to inspire and counsel people as to how to commit lone-wolf attacks in the West. The defendant knew this. He read Inspire before he left on his trip to Yemen. He discussed Inspire with other people in Yemen.

More importantly, in December 2009, right around the time the defendant embarked on his first journey to Yemen, AQAP was in the news for having recruited a Nigerian citizen to travel to Detroit and attempt to detonate a bomb sewn into his underwear over U.S. air space. The defendant was well aware of this, as he has admitted. All of this was in his head before he undertook the first arduous journey from Nigeria to Yemen, illegally crossing borders, going through many military checkpoints from Cameroon to Chant, to Chad, to Sudan, then smuggled by boat to Yemen, and then smuggled in a bus to his ultimate destination.

So the fact that the defendant says it wasn't until the United States submitted -- indicted him and submitted an extradition request that the question "What does my crime have to do with America" ever occur to him is simply not credible. That's what AQAP was known for, its

targeting of America; its targeting of the West.

This wasn't just another generic Jihad different group particularly in 2009, 2010, 2011 it was making a name for itself as the group most determined and able to conduct attacks in the West.

At the time the defendant undertook this journey, by his own telling his family was in pretty dire economic straits, and he asked the Court to consider those straits as mitigation here, but provides no explanation for why those dire straits in no way mitigated his desire to abandon his family and go to Yemen to conduct Jihad.

He was arrested.  He traveled with another person at that point in time, was arrested, and reported back to Nigeria.  He immediately turned around, collected money for the return journey, and made the trip again.  This time he left behind a pregnant wife.

Again, these the circumstances that he cites to the Court as mitigating, but did not at all deter him during this period in his life from prioritizing violence over family.

During his second trip to Yemen, he took care to ensure that he would be able to connect with AQAP when he landed there, and to maintain contact with his radical contacts back in Nigeria.  Before he left, he and his co-conspirators set up two particular e-mail accounts for

21

them to use to communicate.  When he arrived, his coconspirator at his request sent an e-mail to al-Qaeda letting them know that he had arrived, and that ultimately led his being taken to various AQAP stake houses, where he met other foreign fighters associated with the group, to receive weapons training, and work on AQAP's communications language media operations.

According to at least two people who were with the defendant during that time period, he was a dedicated, excited, and enthusiastic recruit to AQAP.

Again, it bears emphasis that all of the evidence shows that the defendant went to Yemen with this goal.  The defendant had never admitted that you.  He has given all sorts of inconsistent statements about how he fell in with al-Qaeda.  But the one consistent part is that he insists he didn't go to Yemen with that intension.

According to the letters from his family, he gave them all sorts varying explanations.  I think his mother says he went to go get a job.  His wife says he went to study Islam.  I'm not sure what he told everyone else, but he doesn't seem to have ever really tell the truth about it. The reason that's relevant here is because it's hard for us to really rely on his assertions that he's changed his mind, when he cannot come to terms with whether he made up his mind in the first place to engage in violent Jihad.

22

According to the people who were in Yemen with the defendant, he continually sought out additional military training.  He's trained in how to use an AK-47.  He used one in an altercation with Yemenese police at a checkpoint.  He also worked on the English language media, according to his own words he understood the perks of that media was to inspire lone-wolf attacks in the West.

At a certain point the defendant was dispatched back to Nigeria by Anwar al-Awlaki, specifically as a result of several private meetings into which we have no window other than what the defendant claims happened.

The defendant essentially claims that he was threatened by al-Awlaki into going back to Nigeria to recruit five other English speakers to send back to the group.  Both important halves of those statements don't ring true.

The first and most important is the threat.  The idea that Anwar al-Awlaki, who at that point was the most hunted al-Qaeda in the AQAP figure in the world, whose father was engaged with a lawsuit in the United States to get him off what his father understood to be a kill list of the United States.  The idea that man would let somebody he didn't trust, and in fact he trusted so little that he felt he had to threaten into working with him, leave his area of control, knowing very well all the safe houses that AQAP was

23

using, al-Awlaki's whereabouts, al-Awlaki's operation for security measures, how the members of the group dealt with the internet and phone, and the precautions they took, how they navigated through the area in order to avoid being caught by Yemenese authorities, that al-Awlaki would let someone with all of this information whom he didn't trust leave Yemen, first and foremost, and on top of that go to a country with an alliance with the United States, where he would be able to reveal that information to anybody he chose is simply not credible.

Again, I think the defendant's continual misstatements on this regard, continual insistence that firstly he never really fell in with AQAP wholeheartedly; and, secondly, that even the actions he undertook on their behalf were under duress, suggests that his true feeling about this group and its goals are not known to us or to the Court at this time, and that his words cannot been taken at face value.

What we do know about al-Awlaki at this time, and AQAP at this time, is that the group was focused on attacks in the West.  The group was looking for foreign fighters, meaning people with access to the United States and Europe. The defendant's brother has been to the U.S. multiple times for work as a respected executive in a multi-national company.  Has another brother who lives in the U.K., could

24

reasonably be expected to be somebody who would have a visa granted to one of those countries.

In addition, al-Awlaki was looking to increase the respect with which the group media operations were viewed, and particularly their ability to attract western youth. And, in this regard, he had also dispatched another individual that the defendant was in Yemen with named Sam to the United Kingdom at the same time. After having Sam work extensively on the media, his next role for Sam was to go to the U.K. and conduct an attack in the U.K. Sam was arrested there and found with a similar amount of cash as the defendant, as well as bullets.

The defendant mentioned the attack on Charlie Hebdo. One of them, Cherif Kouachi, was also trained by AQAP and dispatched by al-Awlaki in this time period to return to France and conduct the attack that he ultimately did.

All of this was what was going on in the group at that time, and what had been standard practice, and suggests that the defendant was dispatched to Nigeria firstly not under any threats, but willingly; and, secondly, with a goal that extended beyond just sending five people back and being done with the group. And, in fact, the defendant's actions upon returning to Nigeria further supports that fact, because he in fact immediately tried to let al-Awlaki know

25

that he had reached Nigeria.  He sent him a message, again doesn't quite comport with the idea that he was running afraid from al-Qaeda and Yemen at that time.  He tried to recruit people to go to Yemen, including his close friend and co-conspirator Luqman Babatunde.  Not somebody he did not at all care about, since he would happily go to the wolves for, somebody he cared about a lot.  He tried to recruit him to go to Yemen and told Babatunde that he would either go back with him or meet him there, suggesting that the defendant himself was intending to return to Yemen.

All of that goes to suggest that the defendant was up to more than we can now -- then we can prove he was up to.  We are not asking your Honor to hold him responsible for any theoretical plot or the like, but only for his actions.  I bring this up because again his consistent denials and refusals to acknowledge his motivation, his agreement, and his actions cast significant doubt upon his expressed denunciation and remorse, and I think all of that goes into the ultimate question of what sort of sentence is necessary to protect the public from the defendant's future crimes.

He certainly appears to have been a model prisoner.  I don't take any issue with his claims to that front, or with anything that counsel or he has said about his time in the MCC.  But I think all of that is readily

26

understood, is the defendant's desire to -- understandable and legitimate desire to minimize the ultimate amount of time that he spends in U.S. prison.  But I don't think his desire to spend as little time as possible in prison here, and his willingness to conform his actions to that standard, really tell us very much about what his intentions are with respect to violent Jihad, once he is a sentenced prisoner in the United States and once he is released.

So we ask your Honor to take all of those facts and factors into consideration, when fashioning a significant sentence here.

THE COURT:  Okay.  Thank you.

One of the consequences, looking ahead, right, no matter what the sentence is, we are looking ahead, years ahead, even that the requested sentence by Ms. Hoyes looking years ahead and predicting, as you put it, the likelihood that he would commit future crimes.  So it's kind of a speculative difficult task at best.

But what can you tell me about the impact on the ability of someone who was once sworn Jihad to rejoin the fight that a denunciation like the one that he's made here publicly has?

MS. AHMAD:  We have not seen many instances of al-Qaeda taking any issue or reprimanding its members for breaking with the group, once they are in the criminal

27

justice system, in order to either be acquitted or get a lower sentence.  There are certainly some people who come into the system and use it as a platform for espousing those views, but that's a personal decision that people make. It's not what al-Qaeda teaches its recruits they should do or advises them to do.  In fact, most of the advise given is how to get yourself out of a jam.

So I don't think that they would view his denunciation or actions here as anything less than trying to get himself out of this situation.  And, in fact, I think it would be a source of great pride and a way to stick one's fingers in the eye of the United States, if in fact after all of this time he would then rejoin the fight and was heralded as a hero who in fact had beat the U.S. at its own game and the like.

So, I don't think that it would at all negatively affect his ability to rejoin the fight.  I think he certainly would be a much more valuable member for having gone through this process and gone through U.S. prison and come out on the other side.

THE COURT:  Is there like a track record of folks who have denunciated al-Qaeda and then come back to it after?

MS. AHMAD:  Well, there's certainly been people released from Guantanamo Bay who gave up significant

28

inculpatory information about al-Qaeda to the U.S. Government upon release have rejoined the fight.

THE COURT:  That's not the same.  I'm not suggesting you're wrong, but that's not the same.  I'm talking about public denunciation.

MS. AHMAD:  I don't know of anybody whose necessarily back, who has been released from jail yet, so I don't know if there's been that many occasions to test the proposition.  But we have never seen from al-Qaeda any concern with denunciation by its current or former members, or any admonitions against it.

THE COURT:  Okay.

MS. HOYES:  A couple points in response, please, your Honor.

THE COURT:  Yes, of course.

MS. HOYES:  First of all, in a previous side bar conference, I believe that the government stated that AQAP is not present in Nigeria.  The government here said today that -- in its papers said that his commitment was to AQAP.  AQAP is not in Nigeria.  The people that he was connected with when he was there in 2010/2011 are all dead.  So it seems like quite a leap that he would get back to Nigeria -- and, incidentally, it is highly likely that he would be imprisoned again upon his return to Nigeria, and highly unlikely that he will leave the country, and that he would

29

get back to Nigeria and somehow link up with AQAP, which, according to the government, is his one interest.

You know, the crux of the government's argument is that it is not possible that Mr. Babafemi changed.  It's not possible that someone like Mr. Babafemi could change.  If that's the case, we are in a great deal of trouble here in this world.  There are a lot of people who are getting swept up and going abroad, and we need to figure out ways to retrust them.  We are not going to incarcerate -- the U.S. is certainly not going to incarcerate its way out of it. It's not impossible to change.  I think it's entirely consistent with human nature.  What we know about even people who are swept up in some theoretical fanaticism, that they get a taste of it and it's not what they thought it was and it's not for them, and they think about it some more and they reflect, and that's what happened with Mr. Babafemi.

One fact that the government leaves out that I think is critical to this analysis is the fact that Mr. Babafemi did not hold to his agreement with al-Awlaki.  He didn't return to Nigeria to recruit people.  He went on to Saudia Arabia where he knew Nigerians could get work.  He took the money and went to Saudia Arabia.  For all we know he would have been in Saudia Arabia to this day, if he hadn't been found there undocumented and deported back to Nigeria.  He didn't reach out to al-Qaeda or AQAP, or

30

anybody while he made off to Saudia Arabia.

And, your Honor, it is plausible that when he returned to Nigeria, he had some fear of reprisal, and that's what motivated him to follow through in some regard on what the agreement was, and I'm not excusing the conduct and the dangerous criminal conduct. We are not asking for a slap on the wrist. A 15-year sentence is a very substantial sentence.

THE COURT: Thank you.

I think it is important, since we focused on it at my instigation, actually, to place in perspective this whole issue about future crimes by this defendant. I mean, it matters. It's one of the considerations that I not only can, but I must consider under 3553(a). It is difficult, but it is just one factor, and I think other factors on this list of considerations in 3553(a) weigh much more heavily, and I will get to those in a moment. But to finish the thought, I think you are both partly right. I don't think the government is suggesting it is not possible to change. But I think the argument is there's a credibility problem with the assertion that there had been a change, because he hasn't fully accepted responsibility for that, which he has changed from.

I also think it is true that it's not mutually exclusive, when one accepts responsibility for his initial

31

acts and still be able to express an actual change in his outlook. I think those things are incompatible.

In any event, to back up to what I think are more important considerations.

You know, the nature and circumstances of the offense, that's the first factor listed under 3553(a)(1), and here it is hard to conjure a more serious offense.

He, the defendant, sought out and joined this terrorist group. I agree with -- I draw the inference the government wants me to draw that he was aware, given the chronology of events, the chronology of the so-called "underwear bomber crime," and this defendant's journey to Yemen, that he was well-aware that this was a terrorist group that was willing and indeed determined to attack Americans and Europeans in their homelands. This is not a defendant who was sitting in his home connecting to al-Qaeda and the Arabian Peninsula online. He wasn't cajoled into the activity that got him arrested by government agents. No need to wonder whether he would have done what he did but for the initiation by government agents of the events that led to his arrest.

In a very real sense, this defendant certainly was - got a little issue about whether he still is that we just gone over - but he certainly was the real deal when it comes to terrorists. He made a couple of very difficult journeys

32

from Nigeria to Yemen.  He met with the highest level of people in AQAP.  Indisputably lent his talents in the efforts to recruit terrorists.  He engaged in weapons training.  He agreed to recruit others.

I think the government has the better of the argument, based on the facts available, that it's likely he was asked to do more than just simply return to Nigeria and recruit a few folks.  It's hard to completely get a grip on this, on the merits of this dispute over whether he actually got cold feet, and went to Saudia Arabia as a result of that or not.

So the facts could be certainly in sharper relief. But on balance, I meant what I said a few moments ago, I have little doubt about the fact that this defendant chose to be a participant in a terrorist organization that posed a real palpable imminent threat to Americans and Europeans in their homeland, and he knew that, and he needs to be punished for that.

There are circumstances that warrant consideration that pull in the other direction.  The government has mentioned a couple of them.  His treatment in custody in Nigeria warrants favorable consideration.  His waiver of extradition does.  So does his plea of guilty, although that's arguably dealt with sufficiently through the guidelines adjustment.  So does his denunciation, in my

33

view.  You know, in a way we turned away from the system 25 years ago that had as one of its features an ability to take a second look at someone, after some period of incarceration passes.  In this case, and in many others, I find myself second-guessing whether we gave up too much in the interest of the certainty that the abolition of parole advances.  It would be nice.  You know, it is a factor.  It may not be the most compelling factor, in my view, in this sentence, but whether or not there's a need to incapacitate this defendant so he doesn't rejoin the fight is an important consideration.  And it's not exactly the easiest thing in the world to assess how genuine and sincere he is in purporting to have turned away from the beliefs that led him to go to Yemen.

He tells me here today that he wants to have an opportunity to set straight other young would-be Jihadists. And although the government has made a fairly powerful credibility argument, as I mentioned earlier, I don't think his inability to hold himself accountable for his behavior, and the government has a good point there, it's incompatible with his denunciation.  I wish I had a better feel for how genuine it is.  I think I need to -- I know I need to know now in 2015, not ten years from now, make some kind of a judgment as to whether Mr. Babafemi will no longer be a Jihadist when he gets out of prison.  I wish I had a better

34

feel for it.

The sentence that I'm about to impose reflects a slight degree in my view that there's some sincerity in that denunciation.  I hope I'm not wrong about that.  I lie awake at night worrying about it.

I've considered not only the 3553(a) factors, but also the history and characteristics of this defendant.

So the sentence is fifteen years of incarceration on Count One and seven years of incarceration on Count Two. The term of incarceration is to run consecutively on each count, totaling 22 years of incarceration.  It is the Court's understanding that the defendant will be given credit for time served since August 19, 2011 in Nigeria.

No term os supervised release is imposed.

Does the sentence I've given him fall within the appellate waiver?

MS. HOYES:  Yes, your Honor.

THE COURT:  There's a special assessment in the amount of $200 on Counts One and Two, that is due and owing immediately.

Is there any recommendation on where the defendant should be incarcerated?

MS. HOYES:  No, but I would suggest a medium to lower security.

THE COURT:  Okay.  Incarceration at an FCI that is

35

at the most minimal level, as deemed appropriate by the Bureau of Prisons.

Thank you, everyone.

MS. HOYES:  Thank you, your Honor.

MS. AHMAD:  Thank you, Judge.

(The proceedings are concluded.)